NOT DESIGNATED FOR PUBLICATION

No. 127,294

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRADLEY LEE STEBENS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Butler District Court; CHAD M. CRUM, judge. Submitted without oral argument. Opinion filed July 10, 2026. Affirmed in part and dismissed in part.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Jarod M. Regier*, assistant county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before CLINE, P.J., COBLE and PICKERING, JJ.

COBLE, J.: Bradley Lee Stebens appeals his convictions and sentences in Sedgwick County District Court for several serious felony offenses associated with a home invasion and physical attack. Stebens argues that the State committed reversible prosecutorial error during closing arguments and that the district court engaged in impermissible judicial fact-finding to enhance his postrelease supervision period in violation of his due process rights. On our review, we find that although the prosecutor erred, the error was harmless, and we decline to reach his unpreserved constitutional challenge for the first time on appeal.

1

FACTUAL AND PROCEDURAL BACKGROUND

As Stebens' brief describes, Stebens and the victim (referenced here by the pseudonym, Carrie) had a complicated relationship that comingled preexisting financial obligations with romance. Carrie lived in Wichita with her adult daughter and owned a Chinese restaurant.

Carrie first met Stebens when the furnace in her residence needed repair. She contacted her insurance company, who sent Stebens. The following summer, Carrie had issues with her air conditioning unit, and the insurance company again sent Stebens to fix it. Carrie liked Stebens, and, because the landlord for the restaurant property required her to carry a service with an HVAC company, she engaged Stebens for those services in the fall of 2021. For the first year, Carrie and Stebens' relationship was purely professional.

Toward the end of 2022, Carrie and Stebens had a consensual sexual encounter. At one point during their romantic involvement, Stebens told Carrie that he was moving to Texas. When Carrie asked about the reason for his move, Stebens told her that he had liked her for some time, but she ignored him. But when Carrie explained that she was not interested in a committed relationship with Stebens and viewed the encounter as a one-night stand, she said Stebens became angry.

According to Carrie, this sexual encounter was the beginning of an abusive relationship with Stebens, in which he treated her nicely only when the relationship was going his way. When he was unhappy, he berated her and belittled her. Many text messages sent from Stebens to Carrie were admitted at trial.

On Sunday, November 6, 2022, Carrie joined a group from her restaurant at a casino. She did not tell Stebens, thinking that they did not have the kind of relationship that required accountability to one another. But throughout the evening, Stebens sent

2

Carrie frequent text messages and called her. She was embarrassed because people in her group questioned who kept trying to reach her. When Stebens demanded to know where she was, Carrie simply told him she was at home, not feeling the need to explain herself. Stebens told her that he had placed an AirTag tracker on her key chain, which told him that she was not at home. Carrie then admitted that she was at the casino. Stebens threatened to come to the casino to get her and demanded to know who Carrie was with. Stebens was suspicious she was with another man, but he commonly exhibited such suspicions, especially of the chef at her restaurant, with whom she had previously had a romantic relationship. Carrie left the casino around midnight, arriving home at around 12:30 a.m.

Stebens had demanded that she send a picture of herself at her home; so, when she arrived home, she took a picture of herself with her front door and sent it to Stebens. In the picture, she smiled, hoping to appease Stebens and assuage his anger. Stebens responded to the photo by texting: "'Bitch, you about to get that smile fucked right off your face.'" His next text message read: "'Better get some lube, because I'm gonna show you pain.'"

Stebens arrived at Carrie's house, entered her home without knocking, and immediately began yelling. Carrie turned to walk toward her bedroom when Stebens pushed her to the floor and dragged her into the bedroom. He placed an object on the dresser that sounded heavy and metallic, and he locked the bedroom door. Carrie was afraid she was going to die.

Carrie testified that Stebens told her, "[H]ey, I'm going to hurt you. After this you are going to report to police, so this is the last minute of your life." Carrie tried to run out of the room, but Stebens hit her in the face and threw her to the floor. He grabbed her hair and threw her face-down onto the bed. This began what Carrie described to the jury as an extended physical and sexual assault, including Stebens forcibly undressing Carrie,

3

intermittently trying to bind her hands and strangle or suffocate her. Carrie described her unsuccessful efforts to fight Stebens off, including trying to use nearby lamps as weapons. She testified that she kept telling Stebens that she had a sick daughter who needed her care, trying to obtain sympathy because she thought that Stebens intended to kill her. But Carrie claimed Stebens' expression was devoid of emotion.

Eventually, although she did not want to have sex with Stebens, Carrie then gave in, telling Stebens that she did not want to die. They engaged in sexual acts, and ultimately, both were so exhausted they fell asleep. When Stebens awoke in the morning, he left her house to go to work.

Later that morning, Stebens sent Carrie a text message, apologizing: "'[Carrie], I cannot ever face you again. And you never really wanted this. I am sorry it went down like this. I genuinely wanted us to be happy.'" She responded with an accusation that he almost killed her. She also sent him text messages with pictures of her battered face with the caption: "You will like this picture." Carrie told Stebens that she still loved him and that she would not talk to the police. She admitted at trial that she never accused Stebens of rape in any of the text exchanges or told him she no longer wanted to see him.

On the afternoon of November 7, Carrie went to Urgent Care because she could not move her arm normally and because her whole body was in pain up to her neck. Carrie did not report the rape at the Urgent Care visit because she remained fearful of Stebens' reaction.

Carrie did not immediately go to the police because she was frightened of what Stebens might do. She claimed that Stebens held her in his power, and she wanted to please him to prevent the monster from coming out again. Carrie said she hoped that, once she paid him the remaining amount due for his work, he would stop contacting her. But Stebens also said he had planned to buy a house in Texas for which he had paid

4

earnest money, but because of Carrie, he was staying in Wichita, so he asked her to pay $8,700—half his earnest money.

Carrie continued to communicate and interact with Stebens—including communications praising him for his work on behalf of the restaurant and additional sexual encounters—until the evening of November 9. Stebens asked her to do something with him, and she refused and told him she wanted to end the relationship. He became angry and threatened to distribute nude photos he had taken of her without her knowledge during one of their sexual encounters. Stebens demanded payment of $10,000 with $2,500 due that night before midnight. At that point, Carrie realized that Stebens would never leave her alone or stop trying to control her. She then went to the police to report the incidents of November 6 and 7.

Law enforcement recommended that Carrie obtain a forensic sexual assault examination. The subsequent exam revealed no acute injuries in the vaginal area but documented substantial bruising across Carrie's body.

Law enforcement obtained a search warrant for Stebens' cellphone and extracted the text message exchanges between Stebens and Carrie, focusing on the messages sent between November 6 and November 9. A significant number of these text messages were admitted through the testimony of one of the detectives who extracted the messages from Stebens' cellphone.

The State charged Stebens with rape, aggravated criminal sodomy, aggravated burglary, aggravated domestic battery, blackmail, and criminal restraint. The case was presented to a jury for three days in July 2023. Stebens opted to exercise his Fifth Amendment protection against self-incrimination and offered no evidence at trial. The jury returned guilty verdicts on all six counts.

Stebens filed a pro se motion for new trial, alleging prosecutorial misconduct in admitting misleading photos and claiming ineffective assistance of trial counsel. The district court ruled that the motion was untimely and refused to consider the claim of prosecutorial misconduct. Stebens withdrew his allegations of ineffective assistance of trial counsel. Defense counsel filed a motion seeking a dispositional or durational sentencing departure.

Stebens was classified with a criminal history score of G with no objections from either party. Defense counsel presented arguments in favor of his departure motion. The district court noted that Stebens was not eligible for a dispositional departure to probation and denied the motion for durational departure. The court imposed a standard presumptive sentence of 195 months in prison for rape, followed by lifetime postrelease supervision. The court imposed a concurrent standard presumptive sentence of 155 months for aggravated criminal sodomy; a concurrent standard presumptive sentence of 41 months for aggravated burglary; a consecutive standard presumptive sentence of 12 months for aggravated domestic battery; a consecutive standard presumptive sentence of 12 months for blackmail; and a concurrent standard presumptive sentence of 12 months in jail for criminal restraint, for a controlling prison term of 219 months. The court awarded Stebens nearly a year of jail time credit—358 days. The court noted that a special sentencing rule applied because Stebens had been on probation for another felony when this crime was committed and ordered the sentences imposed in this case to run consecutive to the sentence imposed in the other case.

Stebens timely appealed his convictions and sentences.

ANALYSIS

Stebens brings two issues on appeal: a prosecutorial error claim and a challenge to the imposition of lifetime postrelease supervision. We address each claim in turn.

6

I.      *Did the State commit reversible prosecutorial error during its closing arguments by characterizing Stebens as a liar?*

Stebens first contends that the State committed reversible prosecutorial error in closing arguments by calling him a "liar." He concedes that he did not object to the challenged closing statements at trial, but he correctly notes that appellate review is appropriate without preservation of the issue.

Challenges to prosecutorial error during closing argument need not be preserved by a contemporaneous objection at trial. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021) ("[W]e will review a claim of prosecutorial error based on comments made during voir dire, opening statement, or closing argument even in the absence of a contemporaneous objection.").

When considering a claim of prosecutorial error, an appellate court first determines whether an error occurred—that is, whether the prosecutor's actions or statements "[fall] outside the wide latitude afforded the prosecutor in conducting the State's case in a way that does not offend the defendant's constitutional right to fair trial." 313 Kan. at 406.

The wide latitude afforded prosecutors to present the State's case encompasses argument and reasonable inferences drawn from the evidence presented at trial so long as the argument or inferences accurately reflect the evidence and correctly state the governing law. As such, argument may not be designed to inflame the passions of the jury or to otherwise divert the jury from its duty to decide the case on the controlling law as applied to the evidence admitted at trial. In considering whether comments exceeded the scope of permissible argument, the court considers the context in which the comments were made, not in isolation. 313 Kan. at 406-07.

If the court discovers error, then it considers whether the error prejudiced the defendant's due process right to a fair trial. 313 Kan. at 406. Prosecutorial error is harmless only if the reviewing court is satisfied beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. Stated differently, the error is harmless if there is no reasonable possibility that the error contributed to the verdict. 313 Kan. at 406 (citing *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 [2020]; *State v. Chandler*, 307 Kan. 657, 674, 414 P.3d 713 [2018]).

*Propriety of Rebuttal Argument*

Stebens does not challenge anything the prosecutor said in the opening segment of the State's closing arguments. But when defense counsel presented his arguments, he heavily focused on Carrie's motives to fabricate the allegations of rape to counter Stebens' threats to expose her as an "easy woman." Toward the end of the defense closing, counsel outright accused Carrie of lying:

> "It is my client's position, that when she tells you this is a rape—let's be blunt—
> it's not true. It's a lie. There is an interesting thing about lies. They take up lives of their
> own. It gets harder to maintain. The details tend to catch up with the liar—with the lie
> and it becomes harder and harder to sustain the lie. Mark Twain put it this way, 'You tell
> the truth, you don't have to try to remember anything.' Well, that's the thing about those
> little details. The worst lies, of course, are the ones we tell ourselves to sustain our-self
> image, to sustain our self-perception, to sustain our reputation, at least in our own eyes."

Defense counsel then discussed discrepancies in Carrie's testimony in light of other evidence.

On rebuttal, the State picked up the theme of lying:

"[Defense counsel] says that [Carrie] lied. First and foremost, he has a whole lot more latitude with that word than the State does. The State can't even use it. At all. So it comes down to the word credibility. We talked about that. We talked about that in voir dire. How is it that you gauge somebody's credibility? Consistency. We talked about that. Her statements, throughout the time that it was reported, were consistent. She report[ed] the same thing to the Wichita Police Department that she reported to the SANE/SART nurse that she reported to the Andover Police Department. Credibility.

"That word that he used, that the State is not ever supposed to use, let's talk about that one. The defendant told [Carrie] that he was going to Texas and he put earnest money down on a house. And it was her fault that [he] was moving and that he had to pay her—she had to pay him back half of it, $8,700. And she was paying it. And this was before the blackmail. And the whole time she was giving him money.

"Near the end, he said, 'I was never going to Texas. I said that to get money out of you and you were so stupid you fell for it.' What was that word I can't use? That's what he was doing.

"Dishonesty. That's another term that goes to credibility. What did he tell her? 'I cheated on you six times, with three different women, in the time we were supposed to be together.' Dishonesty. That's what he told her. And he goes so far as to tell her—and this is on Item Number 444. 'Who is going to be believed, you or me?' You or me? Who's going to believe you? Or am I the one that they're going to believe, because I've got receipts. I got videos. You've got nothing. Credibility, ladies and gentlemen.'"

Kansas caselaw strongly warns prosecutors to avoid providing the jury with the prosecutor's personal assessment of a criminal defendant's credibility. Although prosecutors may point out inconsistencies in a criminal defendant's testimony and highlight evidence reflecting poorly on a defendant's credibility, our Supreme Court has found that accusing the defendant of lying or calling them a liar is "unquestionably outside the wide latitude allowed in discussing the evidence." *State v. Elnicki*, 279 Kan. 47, 63, 105 P.3d 1222 (2005); *State v. Akins*, 298 Kan. 592, 608, 315 P.3d 868 (2014). The prohibition is not so much characterizing the defendant as a liar as offering the

9

prosecutor's personal view of the defendant's credibility, which occurs when a prosecutor uses a label such as liar, "or the term's alleged euphemisms," to refer to the defendant. *Elnicki*, 279 Kan. at 63-64.

> "[W]hen a defendant presents a version of events that runs counter to the State's theory of what happened, prosecutors almost necessarily imply that the defendant is lying. What is clearly prohibited is a prosecutor expressing the personal opinion that the defendant is not telling the truth." *State v. Boatright*, 320 Kan. 385, 394, 568 P.3d 865 (2025).

Here, the prosecutor repeated the "word [the State] can't use" and referred to Stebens as "dishonest[]." In doing so, the prosecutor stepped over the line of highlighting evidence reflecting poorly on Stebens' credibility and squarely into the realm of expressing her opinion that Stebens was, in fact, lying. The prosecutor could have emphasized the same evidence without directly stating that Stebens was dishonest, but instead improperly exceeded the scope of permissible argument by clearly and repeatedly referencing the "word the State is not ever supposed to use." This was, in our view and as highlighted by our Supreme Court in *Elnicki*, an error.

*Harmlessness*

Although we conclude that the State's rebuttal argument was improper for openly attacking Stebens' credibility, we must consider whether this error undermined Stebens' ability to obtain a fair trial. In assessing prejudice, we assess the context in which the prosecutor's comments were made. The two untruths alleged by the prosecutor were Stebens' discussion of the earnest money for a home in Texas and his alleged infidelity during he and Carrie's relationship. Because Carrie's version of this exchange of money was uncontroverted at trial, there is no realistic possibility that the jury would have reached a different interpretation of Stebens' fraudulent conduct in obtaining $8,700 from Carrie. Additionally, both the home in Texas and the alleged infidelity were tangential

10

issues in the case, not directly relevant to any of the charged crimes, and both were essentially established by Stebens' own admissions in the text message exchanges.

In light of the evidence through admitted text messages and evidence of Stebens' attempts to get money from Carrie, first by telling her he was moving to Texas and then by blackmailing her—which was fully admitted by defense counsel in closing—the State's comments regarding Stebens' claimed lies to Carrie were not so egregious that the comments improperly swayed the jury's deliberations. In other words, we can conclude beyond a reasonable doubt that, if the State had made none of its comments in rebuttal the verdicts would have remained the same. Omitting the State's comments about the evidence would do nothing to omit the evidence from the jury's consideration during deliberations.

And unlike the situation in *Elnicki*, where reversal on the prosecutorial error issue was "a close call" that was strengthened by other trial errors bearing on the defendant's credibility, we have no such additional errors here. 279 Kan. at 67. Moreover, the strength of evidence at trial was considerable. Even when viewing the evidence in a light most favorable to Stebens, his text messages not only supported the prosecutor's improper statements, but they were voluminous and ones sent immediately prior to the assault clearly demonstrated an intent to cause Carrie pain. After he left her house, he sent her a text message, apologizing for going too far, justifying his behavior as necessary to make her see how she was manipulating him. Other strong evidence supported the jury's verdict, including law enforcement officers' testimony about Carrie's interviews, the injuries an officer observed on Carrie during the interview, and photos of those injuries shown to the jury.

Additionally, the district court properly instructed the jury as to its role in the fact-finding process. Specifically, the district court instructed:

11

"It is for you to determine the weight and credit to be given the testimony of each witness.

. . . .

"Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded.

. . . .

"Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions."

We presume jurors follow the instructions given by the trial court. See *State v. Brown*, 321 Kan. 1, 20, 573 P.3d 237 (2025) (citing *Miller v. State*, 298 Kan. 921, 937, 318 P.3d 155 [2014]) ("As a general rule, juries are presumed to have followed the instructions given by the trial court.").

Consequently, given the strength of the evidence at trial and the curative instructions, we find the error in the prosecutor's comments on rebuttal created no real possibility of influencing the jury's deliberations and does not amount to reversible error. Stebens' convictions are affirmed.

II.     *Did the district court conduct impermissible judicial fact-finding by imposing lifetime postrelease supervision based on Stebens' age?*

Stebens next challenges the district court's imposition of lifetime postrelease supervision because the district court engaged in impermissible judicial fact-finding in violation of his due process rights as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). His argument, in a nutshell, is that lifetime postrelease supervision may only be imposed upon a finding that the accused is 18 years of age or older. K.S.A. 22-3717(d)(1)(G)(i). Here, the jury was not instructed to determine Stebens' age beyond a reasonable doubt.

12

Stebens concedes that this issue was not presented to the district court and is raised for the first time on appeal. He contends that this court may address the issue for the first time under an exception to the preservation rule that permits the court to consider a newly asserted theory involving only a question of law arising on proved or admitted facts that is determinative of the case, or when consideration of the new theory is necessary to serve the ends of justice or prevent the denial of a fundamental right. He also contends that the imposition of lifetime postrelease supervision constitutes an illegal sentence because it fails to conform to the applicable sentencing statutes.

The general rule is that an appellate court does not consider issues raised for the first time on appeal, even those of a constitutional dimension. *State v Mendez*, 319 Kan. 718, 730, 559 P.3d 792 (2024). An appellant may persuade the court to consider an issue raised for the first time on appeal by arguing the application of one or more judicially recognized exceptions to the preservation rule. 319 Kan. at 730. Although Stebens has argued the applicability of two of these exceptions, appellate review remains prudential. 319 Kan. at 730-31.

As Stebens notes, Kansas appellate courts have considered *Apprendi* challenges for the first time on appeal. See, e.g., *State v. Campbell*, 307 Kan. 130, 136, 407 P.3d 240 (2017) (considering *Apprendi* challenge for first time on appeal even though controlling precedent existed); *State v. Potts*, 304 Kan. 687, 704-05, 374 P.3d 639 (2016) (same); *State v. Gould*, 271 Kan. 394, 404-05, 23 P.3d 801 (2001) (first applying *Apprendi* ruling to upward durational departures under the Kansas Sentencing Guidelines Act); *State v. Extine*, No. 126,552, 2024 WL 2873496, at *2 (Kan. App. 2024) (unpublished opinion) (considering same *Apprendi* challenge for the first time on appeal and citing cases in support), *rev. denied* 320 Kan. 864 (2025).

Even so, some panels and members of our court have opted not to address an unpreserved *Apprendi* challenge, for good reason. See *State v. Lunsford*, No. 127,962,

13

2026 WL 972956, at *8-10 (Kan. App. 2026) (unpublished opinion) (Warner, C.J., dissenting) (discussing why this type of *Apprendi* issue is not properly considered by an appellate court for the first time on appeal), *rev. denied* ___ Kan. ___ May 19, 2026; *State v. Contreras*, 66 Kan. App. 2d 182, 193-95, 579 P.3d 1278 (2025) (Warner, C.J., dissenting) *rev. granted* 321 Kan. 791 (2026); *State v. Jelinek*, 66 Kan. App. 2d 158, 162-64, 577 P.3d 662 (2025), *petition for rev. filed* October 8, 2025; *State v. Pelham*, No. 127,803, 2026 WL 482634, at *5-6 (Kan. App. 2026) (unpublished opinion) (Bruns, J., dissenting), *petition for rev. filed* March 19, 2026; *State v. Cole*, No. 128,747, 2026 WL 252920, at *2-3 (Kan. App. 2026) (unpublished opinion), *petition for rev. filed* February 4, 2026; *State v. Lucas*, No. 127,689, 2025 WL 3687175, at *3-4 (Kan. App. 2025) (unpublished opinion) (Cline, J., concurring), *petition for rev. filed* January 20, 2026; *State v. Torrence*, No. 128,015, 2025 WL 3048984, at *1 (Kan. App. 2025) (unpublished opinion), *petition for rev. filed* December 1, 2025; *State v. Wicks*, No. 127,785, 2025 WL 2682411, at *1 (Kan. App. 2025) (unpublished opinion), *petition for rev. filed* October 20, 2025; *State v. Skidmore*, No. 127,668, 2025 WL 2682404, at *2-3 (Kan. App. 2025) (unpublished opinion), *petition for rev. filed* October 17, 2025; *State v. Suggs*, No. 127,570, 2025 WL 2682183, at *2-3 (Kan. App. 2025) (unpublished opinion), *petition for rev. filed* October 20, 2025; *State v. King*, No. 127,569, 2025 WL 2682451, at *1 (Kan. App. 2025) (unpublished opinion), *petition for rev. filed* October 20, 2025; *State v. Bednarz*, No. 126,821, 2025 WL 2265714, at *1 (Kan. App. 2025) (unpublished opinion), *petition for rev. filed* September 5, 2025.

As thoroughly explained in Chief Judge Warner's dissent, appellate courts are primarily courts of review—we do not decide issues raised for the first time on appeal, particularly those in which fact-finding is required. *Lunsford*, 2026 WL 972956, at *9. Because "the analysis under *Apprendi* is not a 'pure legal question,'" but requires the court to determine whether the defendant's age was uncontested or supported by overwhelming evidence, this is a decision best left to a fact-finding court. 2026 WL 972956, at *9. By raising this claim for the first time on appeal, Stebens "has circumvented the district

14

court's consideration of this question and prevented the parties from developing or clarifying a record regarding [his] age." See 2026 WL 972956, at *9.

As a result, we decline to consider Stebens' unpreserved challenge to the district court's imposition of lifetime postrelease supervision for the first time on appeal and dismiss his claim.

Affirmed in part and dismissed in part.

* * *

PICKERING, J., concurring and dissenting:  I concur with the panel's well-reasoned opinion except with respect to whether we should review Stebens' lifetime postrelease issue. Given that this is clearly a liberty interest—a lifetime of postrelease supervision—I would find that consideration of the new theory is necessary to serve the ends of justice or to prevent the denial of a fundamental right. See *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021). Because Stebens meets one of the three exceptions to the preservation rule to consider a newly asserted theory, I would consider this issue for the first time on appeal.

Under K.S.A. 22-3717(d)(1)(G), persons convicted of sexually violent crimes are required to serve postrelease supervision terms of 60 months, if under the age of 18 years, or lifetime postrelease supervision, if 18 years of age or more at the time the offense was committed. Both rape and aggravated criminal sodomy are statutorily defined as sexually violent crimes. See K.S.A. 22-3717(d)(5)(A) and (d)(5)(E).

Postrelease supervision is part of a criminal defendant's sentence. *State v. Nunez*, 319 Kan. 351, 355, 554 P.3d 656 (2024). Accordingly, Stebens reasons that any fact that increases the postrelease supervision term for his criminal offenses—here, his age—must be proven to a jury beyond a reasonable doubt. See 319 Kan. at 355. The only exceptions

for proof to a jury are a criminal defendant's admission of the fact and waiver of the right to a jury determination. See *Nunez*, 319 Kan. at 354-55.

The parties do not dispute that the jury in Stebens' trial was not required to consider Stebens' age for any purpose in returning its verdicts. The State contends that sufficient evidence was presented to permit the jury to make an inference about Stebens' age, but this inquiry is part of the harmless error analysis. See *Nunez*, 319 Kan. at 356. Whether the State presented evidence of Stebens' age, or evidence from which the jury could infer that Stebens was older than 18 years of age, the jury was never asked to make a finding about Stebens' age. None of the elements of the charged crimes placed the defendant's age before the jury. So, in finding that Stebens was over 18 years old for purposes of assigning a term of postrelease supervision, the district court could not simply rely on a finding by the jury but was required to make a finding of fact. According to the *Nunez* court, this failure by the district court violated the holding in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt. *Nunez*, 319 Kan. at 355.

*Harmless Error*

> "An *Apprendi* error is harmless if the reviewing court is convinced beyond a reasonable doubt the jury verdict would have been the same absent the error with regard to the omitted element, and that the omitted element was also uncontested and supported by overwhelming evidence. *State v. Brown*, 298 Kan. 1040, 1049, 318 P.3d 1005 (2014) (errors are harmless if the record contains no evidence which '"could rationally lead to a contrary finding with respect to the element that the defendant was over the age of 18 at the time of the crime."' [Citations omitted.])." *Nunez*, 319 Kan. at 356.

The *Nunez* court also noted that an element of the crime may be established by reasonable inference drawn from the evidence presented at trial. 319 Kan. at 356. The

16

State contends that the evidence supported a reasonable inference that Stebens was over 18 years old at the time of the offense. But the State's argument ignores the requirement that the State present some evidence of the defendant's age. See *Nunez*, 319 Kan. at 356 ("The trial record contains no evidence from which a jury could reasonably have drawn an inference that Nunez was 18 years of age or older at the time of the crime."). The evidence of Stebens' age was not contested, but it also was not established by overwhelming evidence.

The application of harmless error in *Nunez* is not the model of clarity. On the one hand, *Nunez* appears to contemplate a harmless error based on a jury's inevitable conclusion as to the existence of the omitted element—the age of the defendant—based on reasonable inferences drawn from evidence presented at trial. On the other hand, *Nunez* emphasizes the uncontroverted and overwhelming nature of the evidence of the omitted element. 319 Kan. at 355-56. There appear to be no published cases resolving this tension. The only decision to address *Nunez* in the context of a jury conviction is an unpublished decision of this court, which adopted the view that the age of the defendant could be inferred through circumstantial evidence of age presented at trial. *State v. Scott*, No. 127,349, 2026 WL 631237, at *11 (Kan. App. 2026) (unpublished opinion) (record of defendant's medical exam performed after arrest showed defendant's age), *petition for rev. filed* March 24, 2026.

Even with adopting the *Scott* panel's reading of *Nunez*, the evidence in this case is problematic. Stebens did not testify and did not speak to police in a recorded interview that was played for the jury. See *State v. Sanders*, 65 Kan. App. 2d 236, 253, 563 P.3d 234 (2025) (finding undisputed evidence of defendant's age based on detective's testimony that defendant told him his date of birth at arrest). The State contends that the circumstances of this case justify an inference that Stebens was an adult, not a juvenile. Carrie testified about the employment relationship she had with Stebens for a year before she became romantically involved with him. Stebens owned his own house in Wichita.

He held a professional license. The State also alleges that the age of Stebens was not a contested issue at trial.

None of the circumstances cited by the State support a reasonable inference that Stebens was over 18 years of age without additional information. For example, while Stebens lived in his own house, nothing in the record supported a conclusion that he was on the title of the house as opposed to renting or living in a house owned by someone else. He held a professional license, but the record contains no information from which to infer that a person must be at least 18 years old to hold a professional license for HVAC service. One might assume that a woman in her fifties would not engage in a sexual relationship with a person who was a minor, but such assumptions cannot form the basis for a reasonable inference. Consequently, while the broader record demonstrates that Stebens was born in 1975, the evidence presented to the jury (other than Stebens' physical appearance) did not support an inference that his age was at least 18 years.

Presumably, similar circumstances supported the district court's conclusion that Stebens was over the age of 18 years. The circumstances relied on by the State to justify an inference regarding Stebens' age do suggest that Stebens was an adult rather than a juvenile, but the absence of evidence in the record regarding Stebens' age precludes us from finding harmless error. The absence of evidence about Stebens' age does not constitute overwhelming uncontested evidence. Just as in *Nunez*, the absence of any evidence regarding Stebens' age precludes application of harmless error to the *Apprendi* violation. See *Nunez*, 319 Kan. at 356.

Therefore, I would rule that Stebens' lifetime postrelease supervision should be vacated, and the case should be remanded with instructions to resentence Stebens to 60 months of postrelease supervision. See *Nunez*, 319 Kan. at 357.

18